Good morning, Your Honors. The insurance provision in this case covers loss resulting directly from the use of any computer to fraudulently cause a transfer of property from inside Apache's banking premises or premises to a person or place outside of that premises. There are four reasons, essentially, why the district court erred in finding that the claim at issue was covered. The first issue, before you start on your substantive points, state, and Apache doesn't raise this itself, but we determine our standard of review, not the parties. And there's a question about whether you adequately preserve all of the issue you're presenting here in district court. It seemed in district court you focused on just the use of the word directly and now here you're broadening that to say directly through the improper use of a computer or whatever the provision in your policy says. Well, Your Honor, I... To fraudulently cause a transfer. In other words, your point was more limited in district court than it is here on appeal. I believe, I wasn't involved in the underlying, in the trial court phase, but I've read the briefs and I understand that it's being argued maybe somewhat differently, but I think the fundamental points that we're raising were raised before the district court, although maybe they weren't flushed out as much as they were in our brief. And part of that may just have to do with page limitations in the trial court. I know that in, it's been a while since I looked at those briefs, so I didn't think that we would have to, that this issue was going to come up today, but I know that, I know that there's a heading in one of the briefs, I believe, that says the email did not cause the transfer of funds, which is our first argument. When you're referring to briefs, you're talking about briefs filed in the district court. Yes. Of course, we don't have access to those. They're normally not part of the record. Are they part of the record in the district court? I believe that they're a part of the record. And, well, if they're not a part of the record, I don't know how the question of whether the argument was weighed below or not could even exist. I mean, in order to know if it was raised or not, we'd have to look at the briefs. Well, it could have been raised in your summary judgment motion. The summary judgment motion before the court, one of the parties could have stated it totally, but go ahead. That's what I'm referring to, not the cover motion itself, but the briefs that were filed along with the motion in the trial court. Importantly, also, the key cases that we rely on in making the first two arguments, which are the ones that don't relate to the resulting directly from issue, were cited to the court below. Essentially, every case that's ever interpreted the language at issue was cited to the court below. And the first of those cases, the most important one, I believe, is Pestmaster v. Travelers, which at the time of briefing on this appeal was a district court opinion from the Central District of California. Since briefing was complete, the Ninth Circuit has affirmed that ruling, and its opinion is profound in its simplicity. It's about two paragraphs long. And the Ninth Circuit looked at the language of the provision and said, you know, common sense here dictates that this was not at some point in the transaction. I don't think it's overly cynical to say that no insurance company could afford to underwrite a risk like that. In today's modern digitized world, that would mean that essentially every single fraud is covered, because... But that's a plausible interpretation of the words. I disagree that it's a plausible interpretation of the words. For several reasons. One is what's pointed out by the Central District of California's opinion, which is the placement of the word fraudulently as connected to the use, the manner in which the computer is used, as opposed to just this is a transaction that involved fraud at some point. That this is a transaction that involved fraud at some point or another. So the placement of that word focuses on the manner in which the computer was used. To use a, which gets to the concept of what is, what is a fraud, what is a computer fraud versus what is an ordinary fraud. An ordinary fraud is when you deceive a human being. That's what happened here. Apache's employees were deceived into transferring funds to a bank account other than the one that they intended to, that belonged to someone other than their intended recipient of the funds. The deception... It does say use of any computer, which would, it's clear there was a use of a computer, to fraudulently cause, and there was fraud in the transfer, and it caused the transfer. I mean, it's, I mean, I don't know how, I mean, I don't, your argument is, you know, is a sound, good argument, but it is, seems to me, contrary, I mean, maybe the way it should read, but the way it should read and the way it does read, you know, creates a sort of a problem for someone that may want to accept your argument. Well, what the Ninth Circuit says... This is going to be a friendly question. Don't we have to consider the word directly in that clause? Yes, absolutely, and that, as, as Your Honor pointed out earlier, that is the primary focus of, of the argument below and of the district court's opinion. The word, the word directly implies that there has to be a direct connection between the use of a computer... What about in the, I mean, I'm asking because I don't have my mind made up by any means, but directly also is meant to say, resulting directly to the insurer. Directly modifies the insurer. Well, directly has, could have many meanings, and depending on the context of the claim, that, that is one of the meanings, of course, is that the loss has to be directly insured as opposed to a third party. But the, what the district court did, the holy grail of contract interpretation is that we look at the plain and ordinary meaning of the words that are used. Whenever John Doe, homeowner, buys a policy that covers first party loss to his property, and it has the words resulting directly from, I'm sure that he doesn't think what this means is a modified version of the proximate cause standard that requires substantial factor analysis but not foreseeability analysis, which was used in a workers' compensation case by the Supreme Court of Texas in interpreting a causation language that did not use the word directly. So, and that's what the district court did. If, if we look at this on the fundamental levels, what is the plain and ordinary meaning of direct? It means two things connected to each other without anything in between them. And when we translate that into events as you have one event, you have another event, and there is a direct connection between them with nothing in between. In this case, one event is an email which has attached to it a letter which asks for a transfer, not for, actually it does not ask for a transfer, excuse me, it asks for a change in banking information. And on the other end, you have after services have been performed by a legitimate vendor, invoices have been submitted by that legitimate vendor, Petrofac has, or Apache has approved the invoices for payment after going through presumably its normal processes of determining that the work is done, that it wasn't done in a shoddy manner, and then Apache itself initiates wire transfers. There are several intermediate steps between the use of the computer, which is just the sending of an email, and the end result being the loss. In, in all of those intermediate steps break the causal chain in this case. Now, the standard, you know, causation. State those intermediate steps again between when the email arrived with the requested letterhead and the actual payment of the invoice. Well, from a timing perspective. In effect, you're arguing superseding intervening calls, in effect, in a way. So what were those steps other than an Apache employee telephoned the number on the letterhead to verify the for this new account, and then a different Apache employee approved and implemented the change, putting the change for the new account. Is there anything else? Yes, because if that was all that occurred, there would be no loss. Well, and then there was a payment later, but. There was a payment later, but the payment was not based on anything that was in the email or anything that was in the letter that was attached to the email. What the payment was based on is legitimate invoices from a legitimate vendor who had performed legitimate work. And that entire process, approving those invoices, that process had nothing to do with the Latvian scam artists who sent the email. Those are all intermediate steps. And, in fact, this gets to a more fundamental point that we made in the brief, which is at the very least, we know that for there to be coverage, the use of the computer has to cause a transfer of property. In this case, the use of the computer caused a change in the transfer of property, fraudulent or otherwise. Unauthorized, authorized, fraudulent, it doesn't matter. This email said, please change this banking information. It didn't say, please make this transfer. It wasn't a directly logging in to online bank, use online banking to make a transfer. It just said, if you make transfers in the future, make them to this account. And so it wasn't even a cause of a transfer, much less fraudulently causing a transfer. So, stepping back, even if we go to... Well, the email did say, all future payments must now be made into this account, didn't it? I believe that that's correct. I'll take your word for it. But it didn't say, please make a payment of $1 million into this account. It's, if there are future payments, they should be made into this account. That's how I interpret that phrase. It doesn't ask for a specific dollar amount. It doesn't tie it to any work that was done. It doesn't tie it to any particular contractual obligation. So, all it says is, if there are future transfers, send them into this account. It says, the new account takes an immediate effect, and all future payments must now be made into this account. It's not saying, if there are going to be. I mean, it's more direct than that. Maybe that's a little more direct, but I think implicit in it is that there's going to be a separate request for a transfer of funds. And, in fact, there were in this case, because they're in the record. It's all based on invoices that came from the legitimate corporate vendor. Apache itself admits that. It says, in fact, in Apache's brief, they refer to the transfer of funds as a foregone conclusion, based on the legitimate work that had been done and the legitimate work that had been invoiced. And, for that reason, if the transfers are a foregone conclusion, with or without the email from the lab-mean scam artist, that is an independent cause. I was thinking about it walking over here from, I was at the end of Old Miss, and I walked past the football stadium, and I was thinking about it in terms of football. It's if a cornerback finds out what play is going to be called and is able to tap into the headset of the quarterback and say, don't send it to your primary receiver, pass it to the secondary receiver, because that's who he's covering, and he knows the route, then he's able to jump up and get the interception. He didn't cause the pass. The pass was caused by the initial play call, by all of the actions that the quarterback takes in cocking back and releasing the ball. He caused an interception. An interception is not a pass, just as an interception of funds, which is what occurred in this case, is not a transfer of funds. So what the email caused was the transfer. And, excuse me, what the email did not cause was the transfer. It's the exact opposite of what I meant to say. And for that reason, it's not covered. Let me ask you about Pestmasters. As I understand that case, Priority One, who was the frauder, actually was authorized to do what it was entitled to do, but it was short of funds. And so when it got authorized payments from Pestmasters, it then put that money to improper use. That's not our case here, is it? How will you make an analogy from Pestmasters? What the Ninth Circuit said, when Priority One transferred funds pursuant to authorizations from Pestmasters, the transfer was not fraudulently called. They had to pay the employees, pay the salaries, wages, whatever it was. This is part of the normal business. It seems to me that's all that the Ninth Circuit and the district court in that case were talking about. Well, specifically with respect to the Ninth Circuit opinion, what the Ninth Circuit said is the basic rule, whatever this agreement covers, whatever it doesn't cover, we know that there must be an unauthorized transfer of funds. And that's where the authorization to make ACH transfers for legitimate purposes comes into play. Well, in this case, the actual wire transfers were initiated by Apache's own employees, acting in complete good faith. It just so happens that they believed they had been duped into sending them to the wrong bank account. So the transfers in this case were absolutely authorized. It's the same situation as Pestmasters. Some of the facts leading up to it. Well, that's a matter of definition. Obviously, from the other side, they were not authorized because of the creation of this falsely identified account. It is a matter of where you draw the line, but you don't have that in Pestmasters. I'm not saying you're wrong as your ultimate conclusion. That's maybe yes, maybe no. So I don't see how you're using Pestmasters as a particularly applicable precedent. Well, it's two things. Number one, with respect to the district court's opinion, the Ninth Circuit are slightly different. The district court's opinion focused on the need for the unauthorized use of a computer, which is what I sort of opened up talking about here today. And in that case, there was no unauthorized use because there was an express authorization to make ACH transfers. But in this case, there was no unauthorized use of a computer because for the Latvian, we don't know what computer the Latvian scam artist used. He probably used his own computer. The e-mail account he used, he was also presumably authorized to use that because it was not, he didn't hack into the e-mail account, the legitimate e-mail accounts of Petrofac. He just created his own e-mail account that had a different, from a different domain name. And if I may finish the second point. This is Carl. Sure. Thank you. And the second point is more fundamental. It's that the actual, the Ninth Circuit said the transfer has to be unauthorized. And in this case, the transfer was authorized because Apache authorized it. Apache had been duped into giving the money to somebody other than who it intended to because its employees had been duped. But it was still employees acting in good faith intending to do right by the company who initiated and authorized those transfers. Thank you very much. Thank you, Mr. Garza. I know you've saved some time for rebuttal. Ms. Milner, we'll hear from you. Thank you. May it please the Court. I'd like to start with just a few important facts that have a lot of relevance to the legal discussion in this case. When Apache received this email, there were several fraudulent things about it. One is very much particular to the use of the computer, and that is that the fraudsters created this email address, petrofacltd.com, to make it appear as though the email was coming from someone at Petrofac. That was not the actual Petrofac email, but it certainly gave the impression that it was coming from Petrofac. In addition, as Judge Barksdale pointed out, the email did actually direct Apache to make a transfer. It told Apache that all future payments must now be made into this account. After Apache changed the banking information and redirected these payments from the real Petrofac account to the fraudsters' account, it lost $2.4 million. And there is uncontroverted evidence in the summary judgment record establishing that the email caused both the change in the banking information and caused the transfer itself. There are two declarations submitted by Apache employees saying that the receipt of the email from this fraudulent address made to look like a Petrofac address, as well as the fraudulent content of the email that appeared to be on Petrofac email letterhead, caused Apache to change the banking information. There's also a sworn proof of loss. Well, you know, the affidavits or declarations or whatever of that nature seem to conflict with the facts, which I understand as a good practice. And by the way, what line of business is Apache in? I'm not able to find that. Apache is an oil company. All right. After this email was received, as any good business would do, an Apache employee telephoned the number on the letterhead to verify the request. And then after this confirmation, a different Apache employee approved and implemented the change. So it wasn't just they got the email and immediately did it. They followed up on it and checked on it. Unfortunately, they were duped. Yes, Your Honor. And there are quite a number of cases that interpret the directly resulting from language and the causation language in these type of policies that have found that those types of actions do not constitute an intervening cause between the fraud and the loss. For example, in this Court's decisions in the Lustig and FDIC versus Fidelity and Deposit Company of Maryland cases, those cases involve situations in which a bank employee had engaged in some sort of dishonesty or submitting a fraudulent document with respect to loan applications. Those loan applications were then approved by the bank, the loans were made, and then a bank suffered a loss when the borrowers defaulted on those loans. There were quite a number of intermediate steps between the employee's dishonest act and the bank's eventual loss. But in both those cases, the Court found that the causation standard would be met as long as the bank could show that it would not have made the loans without the dishonest behavior of the employee. And similarly here, the steps that Apache took after receiving the email were just the normal administrative processes. And the fact that Apache did not detect the fraud is not considered an intervening cause under the case law. Why don't I ask you, excuse me, you following up? I'm not suggesting it is an intervening, superseding cause, but I am suggesting it has effect on the word directly from. Yes, Your Honor. And in Texas, directly resulting from means a first-party loss plus cause and fact, which is but for and substantial causation. What is your best case for that, which is what my question was going to be? In the Texas case law, you cite Lustig and some others. What to you really should capture this and make it clear under Texas law? What case? I think there are two sets of cases. One set is the BJ Services and Lynch cases, which were affirmed in relevant part by this court, that hold that directly resulting from means only first-party coverage and not third-party coverage. And then that is combined with this court's decisions in the Lustig and Fidelity and Deposit Company of Maryland cases on the issue that resulting from means but for or approximate cause type standard. And in addition, with respect to the meaning of resulting from, there is a Texas Supreme Court case, the Lancer case from 2011, cited in our briefs holding that resulting from means cause and fact. So when you put together the meanings of the directly and resulting from meanings, you get first-party loss for directly and cause and fact for resulting from. And that's supported by the history of the development of these policies, in which insurers originally just said that the loss had to result from the covered event. Courts interpreted that as meaning that proximate cause was required. They employed a foreseeability standard that allowed coverage for third-party losses. And so to confirm that the policies were only intended to cover first-party losses, insurers added the word directly. So we can see that the word directly does, in fact, refer to the limitation of first-party losses and resulting from retains that cause and fact meaning. Counsel, what do you do with the argument, Judge? Charlie mentioned it earlier, the opposing counsel does, that since computers are so significantly involved in all activities, including fraud, this is a general fraud policy the way that you read it. A few incidental acts of fraud maybe aren't covered, but a very high percentage of the kinds of fraud that would occur, improper transfers, would be generated at some way if you have just a but-for approximate cause standard, would be generated by computers. Is that just the insurance company's problem, or do you have an answer that this is more limited than that? I do believe that, and I think this is actually illustrated by the Pestmaster case, I do believe that the computer use itself needs to be fraudulent in some way. I certainly understand the Ninth Circuit's position in affirming the majority of the Pestmaster opinion that this should not be interpreted to mean that if the insured can simply cite that there was a computer somewhere around, that that fraud is covered. Here what we have, the entirety of the fraud occurred in the email, which is a use of a computer. And not only was the content of the email fraudulent, but it was sent in a fraudulent way that is particular to the use of a computer, and that is mocking up this email address to make it appear as though the sending computer came from Petrofac. And we know that this method of sending was important for two reasons. One is that the fraudsters attempted to perpetrate this fraud by telephone, and that method of communicating the information was rejected. So there's something important about the method in which this fraud was perpetrated. Could this fraud have occurred without the use of a computer? We don't know that. Great American has certainly speculated that that is the case, but I believe an insurance policy covers the event that actually happened, and not just losses that could only have happened in the particular way that's covered. Almost any theft or fraud could have happened, could have, the loss could have been experienced through any number of methods. Counsel, you know your opponents in counsel's brief better than I do. He makes the point that the final step, which is sending a letterhead, whatever, could have been done by, of all things, U.S. mail. I think it's still out there. Scottish mail in this case, actually. Scottish mail in this case. Scottish mail. You're correct. Absolutely. Why would that matter? What is the argument, and respond to it, that the insurance company is making, that that would matter, that it could have been done that way? I don't think it does matter at all. Well, I'm asking you what is their argument that it does, and then respond to it. Okay, if you don't remember, that's fine. I don't remember any case law being cited. I don't think they do. I'm sorry. I don't remember any case law being cited by him, but you're making that point now, and I'm just wondering how that works with the insurance company's argument. I believe that their argument is that the policy, by its language, requires that the computer use somehow be integral to the fraud, and if the fraud could have occurred another way, then the computer use was not integral. But I think that Apache has responded to that argument by showing that, in this instance, there were aspects, computer-specific aspects, of the fraud that were integral. And the Apache employees, in fact, pointed in the declarations to the fraudulent email address as one of the factors that caused them to change the information and thus transfer the funds. Was there any other provision of the policy that might have just covered this as ordinary theft? No, Your Honor, there was not. Assume that you mentioned this first connection between the persons that committed the fraud, and Apache was by a telephone call, and that wasn't sufficient because Apache said, we want to use your letterhead. Assume the telephone call had been made to Apache on an iPhone, and Apache had made the banking change just based on that telephone call from an iPhone. Would that be something resulting directly from the use of a computer to fraudulently cause a transfer? I certainly would not consider an iPhone that is used for a telephone purpose to be used as a computer. Isn't an iPhone a form of computer? I take your point, Your Honor, and I think that because of the nature of devices, that division between telephones and computers is certainly becoming blurred. But in that case, Apache would also be receiving the telephone call through the telephone mechanism and picking up a telephone and not a computer on the other end. And here, the email evidently was sent from a computer, and it's in the record that Apache received it on a computer. And again, there were certain – What type of computer? That is not in the record, Your Honor. It was some sort of computer at the Apache premises. Now, what was the type of computer used to send the email? We don't know. That is not in the record. The fraudsters were not apprehended, so there's no information available about the specific device that was used. Was some of the money recovered because not all of it had been removed from whatever account it was sent to? Or was there a recovery of some of the funds? That is correct, Your Honor. The funds had been transferred to the fraudsters' account, but the fraudsters had only removed some of that money from the account to some other account that was unlocatable. So once the fraud was known, Apache's bank was able to get those funds back. Were the fraudsters ever detected and charged? They were not. As I think happens in many of these computer crimes, it was suspected that they were from Latvia, but the Scottish police were not able to apprehend them. Is that it, Ms. Miller? Unless you all have further questions on that point, I would like to turn back to Great American's argument that the policy requires hacking. The explicit language of the policy does not require hacking, unauthorized access, or unauthorized use of a computer. The covered event is the use of any computer to fraudulently cause a transfer. The policy does not say fraudulent use of a computer, unauthorized use of a computer, or entry into Apache's computer systems. And there are any number of cases involving similar crime policies where hacking-specific language is used, where unauthorized entry into a computer system is required, but that's not the policy that Apache bought. It seems to me the one authority, best authority they have for that point, is some grammarian at the district trial court level who looked at the phrase, fraudulently cause, fraudulently modifies cause, and worked through that to say that the computer must be itself, the object that is causing this action must have been used in some fraudulent way, which gets you to hacking. That doesn't seem to me a widely viewed understanding what language like this means. But it does seem to me that it doesn't talk about a fraudulent transfer, it talks about a fraudulent cause, at least gives some credence to the argument that they're making, that we're dealing with more than just a fraudulent transaction. We need the operative event itself have been fraudulent in some way, which is the use of the computer. And I agree with that, Your Honor. In this case, there was a fraudulent use of the computer. The fraudulent act was the email, which is a computer use, as well as this use of a fraudulent email address. And I think there's a huge distinction between this case and the Pestmaster case, where, as you pointed out, the initial act involving a computer was completely non-fraudulent. There was nothing wrong with the transfers that were made from Pestmaster by computer to its agent's bank account. Not only was it authorized, but it was non-fraudulent. The fraud didn't happen until later, when apparently without the use of the computer, the agent misappropriated the funds. And I think that is really the distinction in this case. Is the fraud tied into the use of a computer, or was there a non-fraudulent use of a computer followed by a fraud? And here we have the first thing. We have the use of a computer to fraudulently cause a transfer. And the district court in Pestmaster that Great American relies on for the proposition that hacking is required actually did not say that hacking was required. It said that this policy covers cases, quote, when someone hacks or obtains unauthorized access or entry to a computer in order to make an unauthorized transfer, or otherwise uses a computer to fraudulently cause a transfer of funds, which indicates that hacking or unauthorized use is merely one variant of using a computer to fraudulently cause a transfer of funds. And so the policy covers both hacking and anything else that fits under that language. Are you giving up your statutory damages argument? Do you want to address that for a second? We are not giving it up, and I will happily address that as my time is running out. Apache asserted a claim under the Texas Insurance Code, Chapter 542, prompt pay provisions. It's undisputed that the conditions for this are met. The only question is whether the policy that Apache has fits under the fidelity, surety, or guarantee bonds exception. Apache has a commercial crime policy. The coverage at issue is not fidelity coverage, and it's not a bond. Fidelity coverage means protection against employee dishonesty. In this computer fraud insuring agreement, employee fraud is specifically excluded. That's on page 250 of the record in tab 8 of Apache's record excerpts. It's also not a bond. Throughout the Texas statutes, fidelity bond is used very specifically to meet a three-party instrument where the employee purchases from a surety coverage against that employee's dishonesty, benefiting the employer. Here it's undisputed that we have a two-party insurance policy. Great American says that fidelity bonds are sometimes called fidelity insurance, and those are therefore interchangeable, but that's really the wrong question. Commercial crime insurance policies, what we have here, are never called fidelity bonds. I would like to go back to the coverage question on just one point with respect to whether the e-mails or the invoices cause the transfer. I do not have a football analogy for you. You're in the wrong place then. The best way I can think about this is that the invoices simply created the pot of money to be stolen. If a thief goes into a bank, breaks into the vault, and takes money out of the vault, someone had to put the money into the vault, and no doubt there were reasons why that certain amount of money was put into the vault. But we would never say that the person putting the money into the vault caused the bank's loss. We would say that the theft caused the loss. All of those invoices, the majority of which had been received prior to the fraudulent e-mail, all they did was create the pot of money to be stolen. The e-mail directed Apache to pay that entire pot to the fraudster's account, and there is a sworn proof of loss in the record at page 320 that specifically states that the fraudster's fraudulent e-mail caused Apache to transfer the funds from inside the banking premises to a place outside the banking premises. So it's Apache's position that the uncontroverted evidence in the record demonstrates that the e-mail itself caused the transfer. Okay, thank you, Ms. Merlin. Ms. Merlin, thank you. Mr. Garzano. Yeah, there's just two questions I'd like to answer that the Court asked of my opponent. First is, is there any Texas case law that says directly was added to the policy only to exclude losses that are to third parties as opposed to first party loss? The answer is no, there's not. The Texas case that she pointed to interpreted a causation language that said resulting from, and if this Court applies the same exact test that was applied in that case to this case where the language is resulting directly from, it renders the word directly completely meaningless. Now, courts in the record. Let me make sure I understand what you're saying. BJA services, according to their brief, the policy says your company would pay for covered property, loss of covered property resulting directly from. Is it not in that policy, too? It is in that policy. Okay. But the Court did not say that approximate cause standard applies or that the word directly is only intended to exclude third party loss. It just said that one of the things the word directly does is exclude losses to third parties. That was the holding in that case. There was no question of, and I was actually involved in that case, there was no question of whether it was approximate cause versus a direct connection. It was did this money belong to a third party or did it belong to the insured, and that was the question that was addressed by this Court in that case. There's ample case law from jurisdictions all over the country since there's no controlling authority on this question with respect to whether it's approximate cause standard or a more immediate connection, and the fact of the matter is that the Sixth Circuit's opinion in tooling is a very good starting point for understanding the issue because what the Sixth Circuit did is it collected cases from throughout the entire country that interpreted this phrase resulting directly from as used in crime insurance, and it says the majority rule is that there must be an immediate connection. Approximate cause does not have any place in contractual interpretation because it is a tort causation principle that answers, has social duty underpinnings connected with tort law that have nothing to do with the interpretation of what two contracting parties had agreed to. And the cases are cited in the brief, so I won't go into any more detail than that. With respect to the second question, it was could this loss have occurred without the use of a computer? Opposing counsel candidly said we don't know. Well, I actually think we do know because in this case what actually occurred, well, first of all, the reason they don't know is because their policies don't require an e-mail. They don't require anything that's electronic. According to the declarations and the proof of loss, what they submitted, what their policies required was a signed letterhead document. That is not an e-mail, and in this case there was a signed letterhead document. It was attached to the e-mail. It was also, according to the e-mail itself, posted, which I understand in U.K. terminology is a more common way of saying mail, which is what we would say here. So there was a letter that was what was required by the policy, according to Apache itself. It was mailed, which is not the use of a computer. And we know, in addition, that it must have been that letter, not the e-mail, not the cover e-mail, that was the cause of Apache's decision to change the banking account information because the e-mail did not contain any of the banking account information. That information, which was critical, was only in the letterhead document. So the letterhead document was what Apache relied on in changing the banking information, not the cover e-mail, and therefore not the use of a computer. Do we know if all that occurred before the post arrived? Was it done, as far as timing is concerned, through the e-mail, second e-mail that had the copy of the letter attached? I do not know the answer, and that's, I think, probably a result of the fact that there was limited, if any, discovery that was done below. Do we know the date of the e-mail, the date of the transfer? Well, the transfers didn't start occurring until seven days after the e-mail was sent, and I can't answer why. But what I would say in that regard is that Apache has the burden of proving that the claim was covered, so the burden is not really on me to prove that it was the e-mail as opposed to the letter that was the cause. But I want to be clear on this. The attached letterhead, that attached letterhead document, had the fraudulent banking information in it, the new account number in it. Yes. You're simply saying they also supposedly mailed a letter that was identical to what was attached to the e-mail. What was attached to the e-mail was an electronic copy of a hand-signed document that was mailed to them. Right. But they were the same. It was a copy of the letter that was supposedly mailed. As far as I know, they were the same. I'm out of time.  Thank you very much. Thank you, Mr. Graziano. Thank you very much. That completes the arguments that we have on the oral argument calendar for today. So this panel will stand in recess until tomorrow morning at 9 o'clock. Judge Jolly, before Mr. Graziano leaves this campus, he may want to go apply to be a cornerback against Florida State. That game is next Monday, if you can be ready.